FOURTH DIVISION

November 16, 2000

No. 1-99-0412

DENNIS F. MITCHELL and ELIZABETH J. ) Appeal from the

MITCHELL, Individually and as ) Circuit Court

Parents and Next Friends of ) of Cook County.

Christian Francis Mitchell, a Minor, )

)

Plaintiffs-Appellants, )

)

)

) 

)

PALOS COMMUNITY HOSPITAL, a )

corporation a/k/a St. George Hospital ) 

Corporation, JANICE A. GUMPEL, M.D., )

a/k/a Janice A. Gumpel-Leipold, M.D., ) Honorable

S.C., GREGG GOLDBERG, M.D., and PALOS ) Irwin J. Solganick,

EMERGENCY MEDICAL SERVICES, LTD., a ) Judge Presiding.

corporation, )

)

Defendants-Appellees. )

JUSTICE SOUTH delivered the opinion of the court:

This appeal arises out of a medical malpractice action.  Following a jury trial, a verdict was rendered in favor of all defendants and against plaintiffs.  

The undisputed facts established at trial were that on October 29, 1992, Elizabeth Mitchell, who was 34 5/7 weeks pregnant, presented herself to the Palos Community Hospital emergency room complaining of nausea, dizziness and light-

headedness.  She was seen by defendant, Dr. Gregg Goldberg, who after an examination reached a diagnosis of "near syncope," which means fainting or swooning.  Although he was informed that plaintiff was pregnant and that Dr. Gumpel was her treating physician, he did not contact Dr. Gumpel or undertake fetal monitoring.  He released plaintiff and sent her home, where she continued to experience ill-being and vomiting.  

That evening plaintiff went to see her physician, defendant Dr. Gumpel, who had her admitted to Palos Community Hospital.  At that time, plaintiff was placed on fetal monitoring; however, Dr. Gumpel did not order an ultrasound right away or a complete blood count (CBC) work-up. The fetal monitoring did indicate some abnormalities.  After reviewing those monitoring tapes and an ultrasound that was ultimately done, Dr. Gumpel made a diagnosis of abruptio placenta, meaning that the placenta had torn away from the surrounding membranes, and ordered a caesarian section.  The infant was delivered in a condition of ill-being described as hypovolemic shock and now suffers from the life-long condition of cerebral palsy.  

The gravamen of plaintiffs' complaint is that defendants failed to conduct timely fetal monitoring or ultrasound testing, failed to order a CBC work-up, although they knew or should have known that such testing was appropriate and necessary, and that Dr. Goldberg failed to immediately inform Dr. Gumpel of the emergency care rendered to her patient, Elizabeth J. Mitchell.  Other complaints are that Dr. Gumpel failed to timely perform a caesarean section upon reaching a diagnosis of abruptio placenta, which deprived the infant's brain of oxygen, proximately causing his injuries.

The defense has maintained throughout these proceedings that the injuries suffered by the fetus occurred prior to Elizabeth's presenting herself to the emergency room on October 29
, 1992, and that those injuries were already complete and irreversible by the time she came under defendants' care.  While at her place of employment, plaintiff fainted and experienced vomiting and nausea.  Defendants maintain that episode was symptomatic of a loss of blood caused by the placental abruption.  Expert testimony was rendered on behalf of defendants that based upon several factors, which included the infant's high level of nucleated red blood cells, the insult or injury was complete and irreversible before defendants ever saw and examined Mrs. Mitchell.

The issues we are called upon to decide are (1) whether the court erred in admitting the expert opinions pursuant to 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923); (2) whether the court erred by allowing one of plaintiffs' experts to be impeached with a deposition from an unrelated lawsuit when defendants did not produce the deposition prior to trial; (3) whether the court erred in allowing questioning of one of plaintiff's expert witnesses on a “nonmedical” matter; and (4) whether the court erred in allowing one of defendants' expert witnesses to give testimony regarding the hospital's policies and procedures on electronic fetal monitoring that was never disclosed pursuant to Rule 213 (166 Ill. 2d R. 213). 

Prior to trial, plaintiffs filed a motion to bar the testimony of Dr. Jeffrey Phelan on the causation issue pursuant to 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).

A lengthy hearing was conducted.  The defense introduced the depositions of Drs. Phelan, Cefalo, Polk, and Salafia. The plaintiffs introduced the depositions of Drs. Cetrulo and Rothstein.

Dr. Phelan has written articles relating to assessing the significance of nucleated red blood cells (NRBC) in evaluating a neurological injury in an infant.  One such article, entitled “Nucleated Red Blood Cells: An Update on the Marker for Fetal Asphyxia,” appeared in the November 1996 issue of the American Journal of OB/GYN.  He has also published abstracts in the January 1997 issue of the American Journal of Obstetrics and Gynecology, wherein he conducts a comparison of nucleated red blood cells.  He has written a paper on acute fetal asphyxia and its relationship to organ system dysfunctions, which covers nucleated red blood cells.  He also published a paper dealing with acute asphyxia that discusses nucleated red blood cells, and has written an article for the April 1997 issue of OB/G Management, dealing with blood markers to date fetal brain injury. Dr. Phelan has been conducting this research for over 20 years. 

He opines that based upon the initial level of the NRBCs, which was 66%, the clearance of the NRBCs, which was almost 400 hours, the initial platelet count, the onset of seizures, which was 118 hours after birth, and the nonreactive fetal heart rate, the fetus suffered a preemergency room visit insult, 
i.e.
, a placental abruption, which caused a neurologic injury to the fetus. He opined that the injury occurred while Mrs. Mitchell was at work, an hour or so before her arrival at the emergency room and approximately 24 hours prior to the birth of Christian, and that the abruption was not diagnosable until the time of delivery because that is the only time such an injury can be confirmed.  According to Dr. Phelan, this particular abruption was extremely rare because it was concealed or silent, meaning there was no vaginal bleeding or pain in the stomach, abdomen or back.  The presence of one or all of these symptoms would indicate an abruption, and while one may suspect an injury based upon the ultrasound, delivery is the first time a confirmed diagnosis of the condition can be made. It was his opinion that an ultrasound would not have shown anything as far as an abruption was concerned.  At trial, Dr. Phelan testified that, based upon a reasonable degree of scientific and medical certainty, the abruptio placenta and its resulting irreversible damage to the fetus was completed prior to the mother presenting herself at the emergency room.

During his studies on the significance of NRBCs in attempting to fix the time of an intrapartum neurologic insult, Dr. Phelan has excluded children who were anemic because of a possible relationship between NRBC counts and the underlying presence of anemia.  Premature infants have also been excluded from this study because premature babies are born with above-

normal NRBC counts.  Under these studies, Dr. Phelan has established the numerical cutoff on hematocrit below 40%; Christian's hematocrit at birth was around 34%.  Dr. Phelan opined, however, that NRBCs in premature infants are immaterial, unless the child is under 32 weeks, and that Christian's anemia contributed minimally to the nucleated red blood cell count found at the time of his birth.  Dr. Phelan to date has not conducted any research on anemia and its relationship to NRBCs.  His studies do show that, by looking at nucleated red blood cells in certain kinds of babies and at the clearance rate after birth which it takes for those nucleated red blood cells to disappear, it may be possible to determine when an injury has occurred.  Dr. Phelan opined that, in the instant case, the nucleated red blood cells are but one indicator of an insult that predated the mother's admission to the hospital and her arrival at the emergency room on the afternoon of October 29
.  The other indicators are the almost 400 hours it took for the NRBCs to return to zero; the initial platelet count; the onset of seizures, which was 118 hours after birth; and the nonreactive fetal heart rate pattern.

Dr. Phelan also testified at trial that his hypothesis is entitled to general acceptance in the medical community.

Defense witness Dr. Michael Painter, a child neurologist, opined that, based upon a reasonable degree of medical and pediatric-neurological certainty as well his training and experience, the complained-of injury occurred about one or two o'clock on the afternoon of October 29,
 and that the injury set in place an “irreversible cascade of events” resulting in the neurologic injury that the child sustained.  Once the fragile structure of the brain is injured, which in his opinion occurred at the plaintiff's place of employment when she experienced syncope, it was irreversible, and earlier intervention would not have altered the subsequent events.

Dr. Carolyn Salafia, a board-certified anatomic and pediatric pathologist, testified during surrebuttal that after her review of the emergency room records, the community hospital records of the infant and those of the hospital to which he was transferred, Dr. Phelan's articles and the depositions of several physicians, including Dr. Phelan, she determined that the infant had an elevated NRBC immediately after birth of 66 per 100 white blood cells.  She has read a number of articles dealing with NRBCs and has, herself, published two articles on the subject.  She has read two articles of Dr. Phelan's that were published in the American Journal of Obstetrics and Gynecology and the Green Journal for Obstetrics and Gynecology.  It was her opinion, based upon a reasonable degree of medical certainty, that Dr. Phelan's work is generally accepted in the field of medicine.  She testified that the journals in which Dr. Phelan is published are highly selective and that only a minority of manuscripts which are submitted are ever published.  Specifically, she testified that in order for his manuscripts to have been accepted, they would have had to have passed at least one, if not two, rounds of peer review.  Based upon that highly critical and selective review process, it was her opinion that his work on NRBCs is generally accepted in the medical community.

Dr. Charles Bird, who is board certified in obstetrics and gynecology, testified on behalf of plaintiff that Dr. Goldberg deviated from the accepted standards of care for a doctor in his specialty when he failed to evaluate the fetus, which had a rapid heart rate, and failed to call the patient's obstetrician and let her decide what should be done.  It was known to Dr. Goldberg that the mother had fainted, and with that kind of symptom both mother and baby should have been evaluated, which was not done. As to Dr. Gumpel, plaintiff's physician, Dr. Bird testified she deviated from the standard of care in her specialty because she did not order a complete blood count when she saw Mrs. Mitchell, and that once it became apparent that a placental abruption had occurred, the decision to perform a caesarean section in an attempt to rescue an oxygen-deprived baby was done with undue delay.  The fetal monitoring tracings indicated that the baby's heart was not reacting appropriately to the stress and stimuli presented to it.  He further opined that it was a deviation from the standard of care for the nurse on duty who evaluated those tracings to fail to see and appreciate the lack of variability.  

On cross-examination, Dr. Bird was asked if he recalled giving a deposition in an unrelated case.  The specific passage addressed was the witness' response to a question regarding the cause of diminished long-term variability.  In that deposition, Dr. Bird testified that the cause is unknown, that no one could answer that question, and that long-term and short-term variability on fetal monitor strips is not predictive of anything.

Dr. John O'Grady, who is the director of obstetrics at Bay State Medical Center in Springfield, Massachusetts, and board certified, testified to a reasonable degree of medical certainty on behalf of plaintiffs that the evaluation of the fetus by Dr. Goldberg fell below the acceptable standard of care because, based upon the evidence of a syncopal episode by the mother during a period of gestation with an elevated fetal heart rate, he failed to undertake further medical intervention.

On cross-examination, Dr. O'Grady testified that, with respect to the issue of notification of Dr. Gumpel by Dr. Goldberg, Dr. Goldberg's failure to notify Dr. Gumpel probably would not have made a difference.

Defendants called Dr. Norbert Gleicher.  During his testimony he gave an opinion regarding the policies and procedures of Palos Hospital inasmuch as one of the allegations against the hospital was the nurses' failure to follow the hospital's policies and procedures with respect to electronic fetal monitoring.  Dr. Gleicher stated that, in his opinion to a reasonable degree of medical certainty, those policies and procedures had nothing to do with this case because they refer to active labor, and Mrs. Mitchell was not in labor when she came into the hospital.

The first issue we are called upon to decide is whether the admission of the opinion testimony from Drs. Phelan, Painter and Salafia contravened 
Frye v. United States
, thereby constituting reversible error.  The admission of scientific evidence in Illinois is governed by the test set forth in 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).  The classic statement of that test found in 
Frye
 is as follows:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define.  Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  
Frye
, 293 F. at 1014.

Evidence is admissible when the scientific principle on which it rests has gained general acceptance in the relevant scientific community.  
People v. Dalcollo
, 282 Ill. App. 3d 944, 951 (1996). The determination whether to admit expert testimony is committed to the discretion of the court, and the same principle applies to expert testimony concerning a new scientific technique.  
People v. Eyler
, 133 Ill. 2d 173 (1989).  Accordingly, we shall determine whether the trial court's admission of the testimony was an abuse of discretion.

In determining whether a novel scientific procedure is generally accepted in the scientific community, the issue is consensus versus controversy over a particular technique.  
Dalcollo
, 282 Ill. App. 3d at 957.  
Frye
 requires that the thing from which the deduction is made, 
e.g.
, the procedures upon which the results are based, must be generally accepted.  

Drs. Phelan, Salafia and Painter testified that Phelan's theory of using the level of NRBCs, along with the other enumerated factors, at the time of birth to determine the timing of the fetal injury or placental abruption is generally accepted in the medical community based upon Dr. Phelan's articles, which have been published in highly prestigious medical journals.  Dr. Salafia testified to the very competitive and selective nature of accepting articles for publication, which must undergo intensive peer review, and that Dr. Phelan's theory has been put in practice at Children's Memorial Hospital in Chicago.  There is enough evidence in the record for us to determine that the court did not abuse its discretion in admitting Dr. Phelan's opinion.

There are several ways a proponent of evidence subject to 
Frye
 can prove the "general acceptance" of the proffered evidence.  The proponent may use scientific publications, prior judicial decisions, practical applications, as well as the testimony of scientists as to the attitudes of their fellow scientists.  
People v. Kirk
, 289 Ill. App. 3d 326, 332 (1997).

Plaintiff has pointed out that Dr. Phelan's studies on NRBCs are new and have not been tested.  However, as professor Graham has written:

“Newness alone is not a bar to admissibility, for every scientific technique that is eventually accepted must have its first day in court.  Moreover, neither lack of absolute certainty nor lack of uniformity of expert opinion precludes a court from finding on the basis of expert witness testimony and other evidence admitted at trial that *** the scientific test's reliability is, or clearly would be when brought to the attention of the appropriate experts, generally accepted in the particular scientific field in which the tet belongs.”  M.Graham, Cleary & Graham's Handbook of Illinois Evidence §702.4 at 563 (
6th ed. 1994).

We believe that the testimonies of defendants' expert witnesses sufficiently established that Dr. Phelan's opinion has gained general acceptance in the scientific and medical community, based upon the publications and applications in the medical community, and that the court did not abuse its discretion in allowing the evidence.

Plaintiff also argues that the trial court erred in allowing Drs. Phelan, Painter and Salafia to present expert testimony that did not satisfy the requirement of 
Wilson v. Clark
, 84 Ill. 2d 186 (1981).  Our supreme court has held that an expert witness may base his opinion upon medical records even though the reports have not been admitted into evidence.  
Wilson v. Clark
, 84 Ill. 2d 186 (1981).  In following Federal Rule of Evidence 703, the court held that the facts or data reasonably relied upon by experts in the particular field in forming opinions or inferences need not be admissible in evidence.  
Wilson v. Clark
, 84 Ill. 2d at 193;  Fed. R. Evid. 703. For the reasons stated above, we believe that the testimonies of Drs. Phelan, Painter and 
Salafia were based upon facts and data of a type that are reasonably relied upon by experts in this particular field.

Plaintiff next argues that the court erred in permitting defense counsel to impeach Dr. Bird through the use of his discovery deposition in the unrelated case of Nugent v. St. George.  On June 23, 1993, plaintiff filed a request to produce pursuant to Rule 214, the “statement of any *** witness *** relating to the issue of impeachment.”  Five days before plaintiffs' opening argument, defendant Goldberg tendered a copy of a transcript of Dr. Bird's discovery deposition in the case of Nugent v. St. George, stating that he had received it that day.  The judge ruled that the document had been produced in a timely fashion prior to the opening statement.  

Factors to consider when determining the propriety of a sanction for violating a Rule 237 (73 Ill. 2d R. 237) notice include the surprise to the opposing party, the prejudicial effect of the evidence, the diligence of the opposing party in seeking discovery, timely objection to the evidence, and the good faith of the party offering the evidence.  
Hawkins v. Wiggins
, 92 Ill. App. 3d 278, 283, 415 N.E.2d 1179 (1980).  Counsel for Dr. Goldberg informed the judge that he had received the deposition transcript that day.  Such disclosure was made five days prior to plaintiffs' opening statement and eight days prior to Dr. Bird's trial testimony.  Furthermore, after being confronted with his deposition in which he stated that long-term and short-term variability on fetal monitor strips was not predictive of anything, he was rehabilitated on redirect when he explained that in Nugent his testimony was that fetal monitoring "alone" was not predictive of anything.  Under the circumstances, this court finds no prejudice and no abuse of discretion in allowing this testimony.

The next issue we address is whether the court erred in allowing Dr. O'Grady to testify that a notification to Dr. Gumpel of the presence of Mrs. Mitchell in the Palos emergency room on October 29, 1992, would not have made any difference and whether that testimony was too speculative.  Any error in the admission of this testimony was harmless given the other evidence which we have already determined was properly admitted. 

The next issue we address is the propriety of allowing Dr. Gleicher to testify that the hospital's policies and procedures on electronic fetal monitoring did not apply in this case when that opinion had not been formerly disclosed pursuant to Supreme Court Rule 213.  Plaintiff argues that defendants never disclosed an expert who would opine that the policies and procedures at issue did not apply.  This court fails to see prejudice where the referred-to policies and procedures regarding fetal monitoring applied specifically to mothers in labor, and Mrs. Mitchell was never in labor.  The child was delivered by caesarian section once Dr. Gumpel determined there had been an abruption.  The jury was made aware of the fact that plaintiff was never in labor prior to the caesarean section being performed, and the policies and procedures clearly state they apply only to women in labor.  

Based upon the foregoing analysis, the judgment of the circuit court is affirmed.

Affirmed.

HOFFMAN and BARTH, JJ., concur.