LAURA WHITING, f/k/a Laura Burns, Plaintiff-Appellant, v. ROBERT COULTRIP, Defendant-Appellee.

Third District   No. 3—00—0633

Opinion filed August 23, 2001.—Modified on denial of rehearing September 12, 2001.

162

McDADE, J., specially concurring in part and dissenting in part.

James A. McPhedran (argued), of Anthony C. Raccuglia & Associates, of Peru, for appellant.

Raymond P. Fabricius (argued), of Pool, Leigh & Fabricius, of Ottawa, for appellee.

JUSTICE BRESLIN delivered the opinion of the court:

Plaintiff Laura Whiting, f/k/a Laura Burns, filed this action against defendant Robert Coultrip for alleged personal injuries she sustained in a car accident with defendant in a grocery store parking lot. On appeal, plaintiff contends that the trial court erred when it denied her motion for a directed verdict on the issue of negligence and when it allowed defendant to introduce the testimony of a biomedical engineer. We affirm in part, reverse in part and remand, holding that, before novel scientific testimony from a biomedical engineer may be admitted at trial, the proponent of the evidence must prove that the methods of study utilized by the engineer are both generally accepted and reliable.

## FACTS

Plaintiff was driving westbound in a Kroger grocery store parking lot when she was hit on the driver's side by defendant. Defendant was proceeding across the parking lanes going northwest when he hit plaintiff on an angle. Plaintiff filed suit against defendant for personal injuries.

At trial, it was revealed that plaintiff has had back problems since she was 17 years old and had one surgery on her back prior to the accident. Shortly before the accident plaintiff began working as a nurse's aide, which, plaintiff testified, required her to load patients onto cots or gurneys, help them into and out of wheelchairs, and transport them to different areas of the hospital.

Both parties contended they were traveling about five miles per hour at the time of the accident. Pictures of both parties' vehicles showed minimal damage.

Plaintiff testified that she complained of stiffness and soreness to defendant and the police officer at the scene of the accident. After the accident, plaintiff contacted her physician to complain of pain in her back and neck. She eventually underwent surgery on the same part of her spine as the previous surgery and on additional parts. Plaintiff introduced the deposition testimony of Dr. Terry Love, her family physician; Dr. Robert Beatty, the neurosurgeon who operated on her back both times; and Dr. James Wilson, an evaluating, board-certified neurosurgeon. Dr. Beatty opined that the second surgery was necessitated by the accident, and Drs. Love and Wilson concurred.

Over plaintiff's objection, defendant was allowed to introduce the testimony of Officer Robert Cunningham, the officer called to the scene of the accident. Officer Cunningham testified that he had no independent recollection of the accident or being called to the accident scene. He then stated that it was his practice to make a police report whenever any party to an accident complained of injury, but no police report was filed here.

Again over plaintiff's objections, defendant was allowed to introduce the testimony of Gerald Harris, an engineer specializing in biomechanics and biomedical engineering. Using the facts of the collision, Fred Monick, an engineer, calculated the forward and lateral gravitational forces (G-forces) experienced by plaintiff. Using Monick's findings, Harris determined that the amount of force actually experienced by plaintiff was not sufficient to cause the injuries alleged.

The trial court denied plaintiff's motion for a directed verdict on the issue of negligence. The jury returned a verdict in favor of defendant, and plaintiff appealed.

Additional facts will be set forth when they become pertinent to the analysis.

## ANALYSIS

On appeal, plaintiff argues that the trial court committed reversible error when it allowed defendant to introduce novel scientific evidence through the testimony of Monick and Harris on the issue of causation. Because of its dispositive nature, we consider this issue first.

•1 The supreme court has stated that it is within the trial court's discretion whether to admit expert testimony. *People v. Eyler*, 133 Ill. 2d 173, 549 N.E.2d 268 (1989). When the general acceptance of a new scientific technique is at issue, however, the proponent of the scientific method is often requesting the court to establish the law of the jurisdiction for the adjudication of future cases. *People v. Watson*, 257 Ill. App. 3d 915, 629 N.E.2d 634 (1994). Such is true of the case at bar.

Because formulation of the law is, in essence, a function of the appeals courts, we engage in a broad review of the trial court's determination concerning the admission of scientific testimony offered by defendant. See *Watson*, 257 Ill. App. 3d at 924, 629 N.E.2d at 640; *People v. Dalcollo*, 282 Ill. App. 3d 944, 669 N.E.2d 378 (1996). In doing so, we may consider the evidence presented to the trial court, judicial opinions from other jurisdictions, and any pertinent legal and scientific commentaries. *Dalcollo*, 282 Ill. App. 3d at 955, 669 N.E.2d at 385.

•2 We note that not all Illinois courts have utilized a similar broad review when ascertaining the admissibility of novel scientific evidence. See, *e.g., Mitchell v. Palos Community Hospital*, 317 Ill. App. 3d 754, 740 N.E.2d 476 (2000); *People v. Mehlberg*, 249 Ill. App. 3d 499, 618 N.E.2d 1168 (1993). Neither *Mitchell* nor *Mehlberg* contained any rationale for the decision to apply a pure abuse of discretion standard. But, because the question of whether a novel scientific technique is generally accepted within a particular community does not vary according to the unique facts of a case, such question should not be left to each individual trial judge's discretion. *Watson*, 257 Ill. App. 3d at 924, 629 N.E.2d at 640; see also *State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483 (1992); *People v. Barney*, 8 Cal. App. 4th 798, 10 Cal. Rptr. 2d 731 (1992); *Commonwealth v. Curnin*, 409 Mass. 218, 565 N.E.2d 440 (1991).

Our decision to engage in a broad review of the trial court's decision when reviewing novel scientific evidence conforms to the practice of our supreme court. *Dalcollo*, 282 Ill. App. 3d at 955, 669 N.E.2d at 385. In *Eyler*, the court adopted the reasoning and conclusion of *People v. Partee*, 157 Ill. App. 3d 231, 511 N.E.2d 1165 (1987), which relied upon scientific commentaries, apparently not before the trial court, to determine that electrophoresis is a generally accepted scientific technique. *Eyler*, 133 Ill. 2d at 215, 549 N.E.2d at 287; see also, *People v. Miller*, 173 Ill. 2d 167, 670 N.E.2d 721 (1996) (relying upon scientific commentaries and decisions of other jurisdictions in deciding whether DNA evidence is admissible); *People v. Zayas*, 131 Ill. 2d 284, 546 N.E.2d 513 (1989) (relying upon scientific commentaries in deciding whether hypnotically enhanced testimony is admissible); *People v. Baynes*, 88 Ill. 2d 225, 430 N.E.2d 1070 (1981) (relying upon decisions from other jurisdictions in determining whether polygraph evidence is admissible). Having determined that we should engage in a broad review of the trial court's decision, we now consider the substance of plaintiff's complaint.

Prior to trial, plaintiff filed a motion *in limine* to bar the testimony of Monick and Harris. The trial court considered the issue of admissibility then and several times thereafter and each time decided the testimony was admissible. The court cited *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 706 N.E.2d 55 (1999), as a basis for its decision.

The Illinois Supreme Court has adhered to the "general acceptance" standard established in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), for the admission of novel scientific evidence. After determining that Illinois currently utilizes a *"Frye* plus reliability" standard for the admission of such evidence, the *Cropmate* court set forth an exhaustive six-inquiry approach for determining whether

novel scientific evidence is reliable. *Cropmate*, 302 Ill. App. 3d at 368, 706 N.E.2d at 60.

•3 Because we find the *Cropmate* court's six-inquiry approach to be both an instructive, workable framework and a proper statement of the law as it now stands in Illinois with respect to the admission of novel scientific evidence, we apply the *Cropmate* factors to the facts of this case. In doing so, our focus is primarily upon the admissibility of Harris's testimony as it is his testimony that is damaging to plaintiff's case and, thus, his testimony to which she primarily objects.

Precisely what evidence is being proffered? At his deposition, Monick testified regarding the G-forces experienced by plaintiff in the accident. Harris then used that testimony to determine that plaintiff's alleged long-term injuries are not consistent with the forces she experienced in the collision. Harris further testified that the forces experienced by plaintiff would cause, at most, some temporary pain and stiffness.

Will the proffered testimony assist the trier of fact to understand the evidence or determine facts in issue, or can the trier of fact use its own knowledge and experience? In this case, the jury was required to decide whether plaintiff's symptoms and treatment were the result of the collision at issue or the result of her employment and/or preexisting condition. Surely Monick's and Harris's testimony, if believed, would aid the jury in doing so.

If the trial court determines that the proffered testimony will assist the trier of fact to understand the evidence or determine facts in issue, then the court must ask, does the proffered testimony constitute "scientific" evidence? In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d, 469, 113 S. Ct. 2786 (1993), the Supreme Court averred that "science" represents a process whereby theories are proposed and refined. The word "scientific" implies a grounding in the methods and procedures of science while "knowledge" indicates more than a subjective belief or unsupported speculation. To qualify as "scientific knowledge" then, an inference or assertion must be derived by the scientific method. *Daubert*, 509 U.S. at 590, 125 L. Ed. 2d at 481, 113 S. Ct. at 2795. Webster's defines "scientific method" as "the principles and procedures used in the systematic pursuit of intersubjectively accessible knowledge and involving as necessary conditions the recognition and formulation of a problem, the collection of data through observation and if possible experiment, the formulation of hypotheses, and the testing and confirmation of the hypotheses formulated." Webster's Third New International Dictionary 2033 (1986).

Monick is a licensed biomechanical engineer while Harris, also a

licensed engineer, works in the fields of biomechanics and biomedical engineering. Harris has a biomedical engineering degree from the United States Naval Academy and both an M.S. and a Ph.D. in the same from Marquette University, where he is a professor. There is currently no professional engineering license for biomedical engineering.

Monick testified that he calculated the maximum possible speed change and level of acceleration of plaintiff's vehicle at the time of the accident. The bulk of Monick's testimony indicated that he can mathematically compute these figures using various types of computer programs.

Harris testified that he specializes in biomechanics, which is the study of the musculoskeletal system. Using a series of tests, he quantifies musculoskeletal function. Utilizing figures such as those mathematically computed by Monick, Harris studies the amount of force required to cause injury to muscles, tendons, ligaments and bone. In this case, Harris performed a biomechanical analysis of the forces present in the accident. He then compared the forces present and the injury complained of by plaintiff to studies correlating force and injury in the biomedical literature. Accordingly, we find that the evidence offered by Harris constitutes scientific evidence.

If the trial court determines that the proffered testimony constitutes scientific evidence, then the court must ask, is that scientific evidence "novel," or does it involve instead a firmly established method or technique? Defendant argues only that plaintiff does not suggest the evidence is novel and, therefore, it is not. We cannot agree. After an exhaustive search, we find no Illinois cases wherein a biomedical engineer was even certified as an expert, let alone permitted to testify that plaintiff's injuries were not consistent with the type of accident sustained. Additionally, we find less than a handful of cases nationwide in which the admissibility of the testimony of a biomedical engineer was considered; one in which that testimony was held to be novel scientific evidence. See *Clemente v. Blumenberg*, 183 Misc. 2d 923, 705 N.Y.S.2d 792 (1999) (citing an Arizona circuit court case).

If the trial court determines that the scientific evidence is "novel," then the court must ask, does the evidence meet the *Frye* admissibility standard? To determine so, a court must identify the scientific community to which the opinion witness belongs and then determine whether the scientific method or technique is generally accepted within that community. *Cropmate*, 302 Ill. App. 3d at 374, 706 N.E.2d at 64.

We do not doubt that a scientific community of biomedical engineers exists, as evidenced by the fact that degree programs are available in the field and Harris has published both articles and reports in journals which appear to publish exclusively on the topic of biome-

chanics and biomedical engineering. We cannot ascertain, however, from Harris's testimony, whether the scientific methods utilized by him are generally accepted within that community. Indeed, the only relevant testimony offered on the topic was Harris's statement that he published the findings from a similar type of study with Navy pilots in a chapter of a book. While this lends credibility to the Navy study, it does not signify that the study methods utilized by Harris have been accepted by the scientific community to which Harris belongs.

Additionally, Monick testified that he used the photographs of the vehicle damage, plaintiff's repair estimates, and transcripts from the parties' depositions, to determine the G-forces sustained by plaintiff. There is no evidence in the record that use of photographs and repair estimates is a generally accepted method in the field of engineering for determining G-forces. See generally *Clemente*, 183 Misc. 2d at 934, 705 N.Y.S.2d at 800 (the use of repair costs and photographs as a method for calculating the change in velocity of two vehicles at impact is not a generally accepted method in any relevant field of engineering).

After having determined that the scientific technique or method is generally accepted in the relevant scientific community, a trial court must still ask, is this evidence reliable? In reviewing this factor, a court should consider whether the method employed has been empirically tested and whether it has been subject to peer review and publication. *Cropmate*, 302 Ill. App. 3d at 375, 706 N.E.2d at 65. In *Mitchell v. Palos Community Hospital*, 317 Ill. App. 3d 754, 740 N.E.2d 476 (2000), the appellate court determined that defendant's expert witness was properly allowed to introduce novel scientific evidence after defendant introduced evidence that the witness's theories were generally accepted in the medical community based upon articles published by the witness in highly prestigious, selective and competitive medical journals with intensive peer review processes.

Even assuming we could determine from the record that the methods utilized by Harris were generally accepted, we cannot say the methods are reliable. Harris never testified that the specific methods used by him in this case are methods that have been empirically tested and subject to peer review.

Harris did state that the way in which an individual's body responds to a traumatic incident is analyzed and reported to a great extent in biomechanical literature. He also testified that he looked to the biomechanical literature to compare the force and injury levels sustained by plaintiff to other subjects. He did not specify what literature, however, or whether an article must survive the peer review process before its publication in such literature. Although Harris

wrote a chapter in a book concerning his study of the cervical injuries sustained by pilots in rough landings for the United States Navy, there was no testimony offered that the method utilized in that study was the exact method utilized here, that the method was empirically tested or that the book in question was the product of peer review.

Because we determine that defendant did not sufficiently demonstrate that Monick and Harris utilized generally accepted and empirically tested methods in determining that plaintiff could not have sustained the type of injury claimed, we reverse. In doing so, we do not suggest that testimony from a biomechanical or biomedical engineer may never be admitted, only that the foundation here was lacking.

Next, in order to prevent error on remand, we will address those issues that may arise again in future litigation. The first is whether the trial court erred when it denied plaintiff's motion for a directed verdict on the issue of defendant's negligence.

●4 Plaintiff argues that because defendant was obviously negligent in cutting across parking spaces whereupon he hit the side of her vehicle, the court should have directed a verdict as to the issue of negligence and, not having done so, the court should have granted her posttrial motion requesting a new trial.

In denying plaintiff's motion for a directed verdict, the trial court stated that when reasonable minds can differ as to whether the plaintiff's injury was proximately caused by defendant's negligence, a question of fact arises for the jury. The court relied upon Hunter's Trial Handbook for Illinois Lawyers (R. Hunter, Trial Handbook for Illinois Lawyers, Civil § 61.7, at 798 (6th ed. 1989)) which cites *Holsman v. Darling State Street Corp.*, 6 Ill. App. 2d 517, 128 N.E.2d 581 (1955) (when there is evidence fairly tending to show that the negligence charged was the proximate cause of the injury, the question is one of fact for the jury), and *Jung v. Dixie Greyhound Lines, Inc.*, 329 Ill. App. 361, 68 N.E.2d 627 (1946) (when a difference of opinion exists as to whether the injury was proximately caused by the negligence of defendant, so that reasonable minds could differ, there is a question of fact for the jury).

Plaintiff suggests that *Holsman* and *Jung* are no longer applicable in light of section 2—1005 of the Illinois Code of Civil Procedure (Civil Code) (735 ILCS 5/2—1005 (West 1998)), which permits a court to enter summary judgment as to one or more major issues in a case but less than all. We need not decide whether plaintiff is correct in her assertion because the law in Illinois on when questions of negligence become questions of law or, in other words, when a court should direct a verdict on the issue of negligence, was set forth in *Pedrick v. Peoria*

& *Eastern R.R. Co.*, 37 Ill. 2d 494, 229 N.E.2d 504 (1967), which still governs today. The *Pedrick* court determined that verdicts ought to be directed only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on the evidence could ever stand. *Pedrick*, 37 Ill. 2d at 510, 229 N.E.2d at 513-14.

Here, the parties disputed who caused the accident, where it occurred, and whether other parked cars blocked the parties' respective views of one another. Additionally, relying upon plaintiff's testimony that her recent employment as a nursing assistant required her to move patients from cots to gurneys, in and out of wheelchairs and transport them to various areas of the hospital, defendant argued that plaintiff reinjured her back from heavy lifting, not from the accident. Plaintiff's own doctors testified that they would not have recommended plaintiff accept a position as a nursing assistant because of the lifting required.

We cannot say that the evidence when viewed in its aspect most favorable to defendant so overwhelmingly favored plaintiff that the trial court should have directed a verdict on the issue of negligence. Accordingly, we affirm the trial court's decision to deny plaintiff's motion for a directed verdict on the issue of negligence.

●5 Finally, we address whether the trial court erred when it allowed Officer Cunningham to testify to his general practice in filing a police report but limited cross-examination on the same.

A witness may not be contradicted as to collateral, irrelevant or immaterial matters. *Herget National Bank of Pekin v. Johnson*, 21 Ill. App. 3d 1024, 316 N.E.2d 191 (1974). The decision of whether a matter is collateral lies within the trial court's sound discretion, and a reviewing court will not reverse that decision unless there has been a clear abuse of discretion. *People v. Breton*, 237 Ill. App. 3d 355, 603 N.E.2d 1290 (1992).

Plaintiff contends that Officer Cunningham should not have been allowed to testify that it was his general practice to file a police report if any party to an automobile accident complained of injury, because Cunningham could not remember the details of the accident at issue or whether plaintiff, in fact, complained of an injury. Given these circumstances, we agree that he should not have been allowed to testify. Even showing him photographs of the scene did not refresh his memory. Accordingly, we find that Officer Cunningham's testimony was not simply collateral but irrelevant. On remand, the trial court should prohibit similar testimony in any future litigation.

Because this case is remanded for a new trial, we need not address plaintiff's remaining claim that the trial court erred in refusing to

grant her a new trial on the basis that the jury verdict was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed in part and reversed in part and this cause in remanded for proceedings consistent with this order.

Affirmed in part and reversed in part; cause remanded.

SLATER, J., concurs.

JUSTICE McDADE, specially concurring in part and dissenting in part:

The majority has held that "defendant did not sufficiently demonstrate that Monick and Harris utilized generally accepted and empirically tested methods in determining that plaintiff could not have sustained the type of injury claimed." 324 Ill. App. 3d at 169. I disagree and, therefore, respectfully dissent from that part of its opinion.

First, regarding the standard of our review, the general rule provides that the decision to allow an expert to testify in matters of opinion lies within the sound discretion of the trial court. *Soto v. Gaytan*, 313 Ill. App. 3d 137, 728 N.E.2d 1126 (2000). A trial court's ruling with regard to the admissibility of expert testimony will not be disturbed absent an abuse of discretion. *Harris v. Cropmate Co.*, 302 Ill. App. 3d 364, 702 N.E.2d 55 (1999). Indeed, the *Cropmate* court, on whose analysis the majority heavily relies, utilized an "abuse of discretion" standard. Without arguing the merits of the proposed new standard of review, I do not believe that the outcome in this case would be different regardless of whether the trial court's decision is tested as an abuse of discretion, under the broader review adopted by the majority, or *de novo*.

In this case, it is clear from the record that the trial court had several hearings with regard to the testimony of Harris and Monick. During those hearings, evidence was presented regarding the opinions to be offered and the bases for them. After careful consideration of the evidence presented and after conducting a *Cropmate* analysis, the trial court found that the testimony met the "*Frye* plus reliability" standard. This standard implies that reliability is not part of the *Frye* test itself, although a review of the *Frye* factors clearly shows that it is. Based on my consideration of the evidence presented, I cannot agree either that the trial judge abused his discretion or that his decision was wrong under a broader, less deferential review.

The majority finds that the first three steps of the *Cropmate* analysis regarding (1) the evidence proffered, (2) the assistance of the evi-

dence to the trier of fact, and (3) the fact that the testimony constituted scientific evidence were met by the defendant in this case. Since the trial court drew the same conclusion, no further discussion of those factors is necessary.

The fourth inquiry in the *Cropmate* analysis is whether the proffered scientific evidence is "novel" or is, instead, a firmly established method or technique. The proffered scientific evidence pertained to the G-forces experienced by the plaintiff and whether her alleged long-term injuries were consistent with those forces. The opinions to be rendered in this regard were based on Harris's own personal experiments and research, along with other literature, including publications of studies conducted by other scientists. In addition, Harris testified that biomechanics and biomedical research and testing (including his) were being relied on by manufacturers to design thousands of products, including automobiles, airplanes, and carseats. Based on this evidence, and contrary to the conclusion of the majority, it certainly cannot be said that the science on which the proffered testimony would be based was novel within Harris's and Monick's fields of study.

The fifth inquiry suggested under *Cropmate* is whether the evidence meets the *Frye* admissibility standard. This factor is only applicable if the evidence is considered novel and, as set out above, I do not believe the record supports a finding that it is. Nevertheless, because biomedical engineers have not traditionally testified regarding the consequences of various G-forces on a plaintiff in a personal injury case, an analysis of this factor may be helpful.

Under the *Frye* admissibility standard, the court must determine whether the proffered evidence is generally accepted within the community to which the witness belongs. In this case, that would require the court to find that the scientific basis for Harris's and Monick's testimony is generally accepted within the community of biomedical and biomechanical engineers. According to the record, Harris based his opinions on numerous studies involving actual injuries to individuals involved in automobile accidents, including studies dating back to 1955. In addition, Harris relied on his own research completed for the United States Navy, Office of Naval Research, regarding forces sufficient to cause injuries. Finally, Harris testified that he uses biomechanics and biomedical engineering principles to treat disabled children and to teach orthopedic surgeons.

The majority argues that there is no evidence in the record to show whether the studies relied on by Harris were peer-reviewed, or whether his reliance on photographs and repair estimates is generally accepted in this field of study. However, there is no evidence to the contrary either. Even though it would be reasonable to think that at

least some of the articles published since 1955 have been peer-reviewed, I am unaware of any requirement for peer-review in order for a method to be generally accepted in a community. Certainly the continued, practical application of the principles for 45 years would be indicative of some general community acceptance. Moreover, it is entirely reasonable that Harris might rely on photographs and repair estimates, in addition to other evidence, to arrive at his opinions, and such reliance was certainly subject to cross-examination.

The sixth and final step in the *Cropmate* inquiry is whether the testimony was reliable. As previously indicated, the principles of biomechanics and biomedical engineering, which form the basis for the challenged testimony, are relied upon by manufacturers to design thousands of products. In addition, Harris testified that he uses biomechanics and biomedical engineering to treat disabled children and teach orthopedic surgeons. If it is reliable enough for the treatment of children and the education of orthopedic surgeons, it would seem that it should be deemed reliable enough for testimony in a personal injury lawsuit.

Finally, it is important to note that the *Cropmate* court specifically pointed out:

> "[T]he trial court's inquiry at a *Frye* hearing should be a flexible one, and the *** list of questions is intended to help guide the trial court in determining whether the proffered evidence is reliable. It does not constitute a six-part test, in which the proponent of the proffered evidence must answer all of the questions satisfactorily before the evidence is deemed admissible." *Cropmate*, 302 Ill. App. 3d at 375, 706 N.E.2d at 65.

Based on this language, even if the defendant had not been successful in meeting all six parts of the analysis, a showing reasonably sufficient to satisfy the trial court during the course of its multiple *Frye* hearings that the evidence was reliable and should be admitted ought to survive a review based on an abuse of discretion, and even a broader standard of review. At the very most, the case should be remanded for another *Frye* hearing, giving the defendant an opportunity to supplement the evidence to address the concerns raised by the majority. I do not believe that an entire new trial, as prescribed by the majority, would prove necessary.

For the foregoing reasons, I respectfully dissent from the decision of the majority reversing the trial court's admission of the testimony of Harris and Monick. I would find no error on the part of the trial judge on this issue and would affirm the trial court's decision to allow them to testify as experts.

I concur with the remainder of the majority's opinion regarding

the trial court's ruling on the directed verdict and the admission of the police officer's testimony.