SECOND DIVISION
DECEMBER 31, 2008

1-07-0487

| | | |
|---|---|---|
| U.S. BANK, as Trustee of the Roe Ann Lockhart Obra '93 Trust, and the Roe Ann Lockhart of Obra '93 Trust, formerly U.S. Bank, as Guardian and Representative of the Estate of Roe Ann Lockhart, a disabled minor, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 01 L 4891 |
| YMCA OF METROPOLITAN CHICAGO, a Corporation, | ) ) | |
| Defendant-Appellant | ) ) | |
| (Terrell C. Sanderson, as a Duly Authorized Agent, Servant and Employee of the YMCA of Metropolitan Chicago, a Corporation, | ) ) ) | Honorable Dennis J. Burke and Daniel Locallo, |
| Defendant). | ) | Judges Presiding. |

JUSTICE CUNNINGHAM delivered the opinion of the court:＿＿＿

This is an appeal from a judgment for the plaintiff, U.S. Bank, of $15,468,277 entered on a jury verdict rendered in the circuit court of Cook County on October 12, 2006, after a reduction for comparative negligence and setoff for prior payments. U.S. Bank is the trustee of the Roe Ann Lockhart Obra '93 Trust and the guardian and representative of the estate of Roe Ann Lockhart, a disabled minor. Roe Ann was a 12-year-old pedestrian when she was injured on January 8, 2001, in Harvey, Illinois, by a minivan owned by the defendant YMCA of Metropolitan Chicago, a corporation (YMCA), and driven by defendant Terrell C. Sanderson, YMCA's employee

1-07-0487

(Sanderson).[1]  A first jury trial resulted in a verdict for YMCA and Sanderson, but the trial court granted U.S. Bank's request for a new trial.  The trial court found that repeated, deliberate outbursts by trial counsel for the defendants were heard by the jury and prejudiced U.S. Bank, denying them a fair trial.  After the trial court granted U.S. Bank a new trial, the motion of YMCA and Sanderson for leave to appeal was denied by this court and a petition for leave to appeal to the Illinois Supreme Court was also denied.  Accordingly, the second jury trial proceeded to completion, with the verdict noted above.

On appeal, YMCA contends that the trial judge in the first trial abused his discretion by granting U.S. Bank a new trial where there was no on-the-record evidence that the jury heard any of the prejudicial comments by defense counsel.  YMCA claims that because the comments were made outside of the immediate presence of the jury, they could not have been overheard and therefore were not prejudicial.  Alternatively, YMCA seeks a third trial based on what it characterizes as prejudice arising from what it alleges were trial court errors in the second trial.  Those alleged errors were:  (1) giving a non-IPI jury instruction concerning Sanderson's duty of care where a minor was involved; (2) barring portions of the testimony of YMCA's accident reconstruction expert; and (3) refusing to give the jury IPI 501,  missing-witness instruction when U.S. Bank did not call its previously retained accident reconstruction expert to testify on its behalf in the second trial.  Finally, YMCA challenges the damages awarded by the jury.  We affirm.

---

[1]Prior to jury selection in the second trial, U.S. Bank voluntarily dismissed the driver, defendant Sanderson.  Accordingly he was not a defendant in the second trial and he is not a party to this appeal.

BACKGROUND

Two different trial judges are involved in this appeal because the trial judge who presided over the first trial did not preside over the second trial when the case was retried. The entire common law record and transcript of the first trial have been included in the record on appeal before this court. But because most issues relate primarily to the second trial, we need not summarize the evidence adduced in the first trial. The only issue with respect to the first trial is whether the trial court abused its discretion in granting U.S. Bank's motion for a new trial. In its motion for a new trial following the verdict in the first trial, U.S. Bank asserted that one of defendants' attorneys in the first trial had made unfounded accusations that he was the victim of wrongdoing and unfair treatment by U.S. Bank's counsel and by the trial court. According to U.S. Bank, these comments were repeatedly made during sidebar conferences outside the presence of the jury in the court hallway in such a loud voice that the trial court had to admonish defense counsel on more than one occasion to lower his voice because, the trial judge pointed out, the jury could hear defense counsel's outbursts.

At the completion of the first trial, U.S. Bank filed its motion for a new trial soon after the jury's verdict in favor of the defendants. After the verdict but before ruling on U.S. Bank's motion, the trial court entered an order referring the parties to mediation. Pending the outcome of mediation, the trial court took U.S. Bank's motion for a new trial under advisement, without indicating how it would ultimately rule. The mediation effort failed, and about six months after the jury's verdict in the first trial and the filing of U.S. Bank's motion for a new trial, the trial court ruled in favor of U.S. Bank, granting it a new trial. In ruling on U.S. Bank's motion for a new trial, the trial court noted that it had been confronted with the egos of attorneys accompanied by a "grandiose display of

3

arrogance to the judicial system." The trial court concluded that the behavior of defense counsel who was from out of state and admitted *pro hac vice* for this case, had interfered with the rights of the parties and denied U.S. Bank a fair trial. Because of this behavior, the trial court stated, it had no alternative but to correct those wrongs committed by an officer of the court. The trial court noted that although the trial transcript was "replete" with continued prejudicial comments and actions by defense counsel, the record could not accurately reflect what the court had personally observed in reaching its conclusion regarding the behavior of defense counsel. The trial court made findings that it repeatedly had to move the proceedings from the courtroom to sidebar conferences held outside the jury's presence because of the behavior of defense counsel. In making its finding, the court commented that on several occasions, because the deputy sheriff did not react quickly enough, the court itself had to "scramble" to close the courtroom door in an effort to prevent the jury from overhearing continual comments by defense counsel which the trial court found inappropriate. Even with the door closed, the trial court was required to repeatedly order defense counsel to keep his voice down. In its ruling on YMCA's motion, the trial court found that these admonitions to defense counsel were to no avail. Despite the efforts of the trial court and the deputy sheriff, it was the trial court's finding that the jurors heard the loud outbursts by defense counsel. The trial court also noted that the deputy sheriff had informed the court that the jury had told the deputy sheriff that they were "in disbelief" after hearing these "outbursts" by defense counsel. The deputy sheriff's report to the trial court was not recorded in the trial record.

The trial court made a specific factual finding that the outbursts by defense counsel were not accidental but were "purposefully made for the jury to hear." The trial court added that defense

counsel had been repeatedly admonished but counsel had "ignored the Court in an effort to divert justice." The trial court also noted that defense counsel repeatedly came into the court's chambers at the end of a day's trial session and apologized to the trial court for his behavior, thus demonstrating that defense counsel knew that his behavior was wrong. The trial court further noted that another defense attorney had also been admonished only once and never had to be admonished again during the trial. The trial court summarized its ruling and reasoning, in noting that the persistent outbursts and bad behavior of the defense attorney would not be tolerated. The court added, "This Court will not tolerate the conduct of an attorney who disrespects our sacred judicial and jury system." It then granted U.S. Bank a new trial. As mentioned above, appeals to the Illinois Appellate and Supreme Courts were denied following the granting of YMCA's motion for a new trial. The case eventually proceeded to a second trial before a different trial judge. Additionally, in the second trial, U.S. Bank was represented by different trial counsel.

YMCA does not seek a judgment notwithstanding the verdict in the second trial. Rather, it contends that a series of trial errors denied it a fair trial in the second trial and thus it seeks a third trial. Alternatively, YMCA challenges the amount of the damages award.

At the second trial, the evidence established that on January 8, 2001, at about 3:30 or 3:45 p.m, 12-year-old Roe Ann Lockhart began to cross Dixie Highway near its intersection with 150th Street in Harvey, Illinois. She was struck and severely injured by a YMCA van driven by YMCA employee Terrell Sanderson.

Two eyewitnesses testified at trial. The first eyewitness, Willie Ann Hagler, testified that she was stopped at a red light facing in a northerly direction on Dixie Highway where it intersected with

150th Street. It appeared to Hagler that Roe Ann could not cross at the crosswalk because her path was blocked by a mound of snow. Roe Ann stepped into the street twice and twice returned to the sidewalk. The third time she stepped into the street, she was hit by the van, which was traveling in a northerly direction on Dixie Highway, which Hagler first saw virtually at the point of impact. The second eyewitness, Tami Tenish Bolden Blocker, was also stopped at a red light on Dixie Highway where it intersected with 150th Street. She also saw Roe Ann twice step into the roadway and then step back. Roe Ann then looked both ways on Dixie Highway and "dashed out" into the street at a time when the light for the traffic traveling north and south on Dixie Highway was still red. Blocker testified that she did not see the van until it turned the corner from 150th Street onto Dixie Highway and struck Roe Ann.

Terrell Sanderson admitted that he was driving the van which struck Roe Ann, but denied that he turned the corner from 150th Street onto Dixie Highway just before the accident. He testified that he was driving north on Dixie Highway, in the curb lane, approaching the intersection with 150th Street. The light for traffic on Dixie Highway was red, so he slowed to almost a complete stop, perhaps five miles an hour or a little less. But then the light turned green as he was still approaching the intersection. Sanderson's testimony was conflicting in that he also testified that he then proceeded through the intersection at a "very minimal speed," under 20 miles per hour. But he also admitted not being able to recall whether he speeded up. He admitted that as he approached the intersection he saw children wearing school uniforms in a nearby gas station and on 150th Street, but he stated that he did not see anyone at the intersection, nor did he see anyone waiting to cross in the area where the evidence established Roe Ann was preparing to cross Dixie Highway. Sanderson

initially testified that he recalled someone "darting out in front" of his van and being struck by it. But on cross-examination he admitted that he did not see the person until the impact, so he did not actually know if Roe Ann was running or walking into the street. He testified that he stopped and tried to attend to Roe Ann, who was lying motionless in the street. He also summoned emergency help.

YMCA presented the testimony of Michael O'Hern, an expert on accident reconstruction. He testified to certain aspects regarding the accident, including the following. He listed the feet per second (fps) a car would be traveling at various speeds: 22 fps at 15 miles per hour, 29.4 fps at 20 miles per hour, and 36.65 fps at 25 miles per hour. Although varying per individual, the minimum time it would take a driver to move after a light turned green would be one second. It would take a driver 1½ seconds to react when someone ran into the roadway in front of the driver. That reaction time would be cut in half, to three quarters of a second if the driver saw the person beforehand and recognized that the person might cross the street. It was O'Hern's opinion that Roe Ann was running at a slow rate of speed at the time of the collision. It took her between .72 and .78 seconds to move from a distance on the sidewalk of three feet from the curb to the middle of the traffic lane, where she was struck by the van. If she started from the curb, it would take her one-half second to reach the point of impact in the middle of the traffic lane. On the other hand, if she only traveled four feet into the traffic lane, it would take her one-third of a second to arrive there starting from the curb, and nine-tenths of a second from three feet inside the sidewalk. U.S. Bank's objections were sustained by the trial court and O'Hern was not permitted to provide additional testimony that he did not believe that Sanderson had turned right from 150th Street just before the accident, as eyewitness

Blocker had testified. O'Hern was also barred from testifying that had Sanderson turned right from 150th Street, the accident could not have occurred. He was also not permitted to testify that Sanderson had only one-third to one-fourth of a second to react, which was an insufficient period of time in which to brake or take other evasive action, and therefore the accident was "unavoidable." This barred testimony was presented to the trial court as an offer of proof.

There was a great deal of evidence concerning Roe Ann's injuries. She sustained a traumatic brain injury, injury to the seventh cranial nerve, a fractured leg, and injury to ligaments in her left knee. The totality of her injuries left her permanently wheelchair dependent. There was testimony that she will never be able to live independently. A clinical psychologist, Dr. Roger Stefani, who had examined Roe Ann and her school records, was not available to testify at trial. By agreement of the parties, his testimony was presented in the form of his prior evidence deposition. He opined that Roe Ann had suffered permanent brain injury from the accident. Even three years afterward she displayed very significant deficits. Before the accident, when Roe Ann was in fourth grade, she was an A and B student and was reading at a fifth-grade level, although her math skills were about six months behind what was expected. In the fifth grade, still before the accident, she had become a B and C student and had received a grade of D in math. But when Dr. Stefani examined Roe Ann in February 2004, three years after the accident, her reading comprehension was only in the eighth percentile for her grade level. Her ability to retrieve words was below the second percentile for her grade level, and her nonverbal intelligence was below the first percentile for her grade level. Dr. Stefani opined it was highly unlikely she would ever achieve anything near a full recovery of her abilities. Dr. Stefani also stated that the type of brain injury Roe Ann experienced, a shearing of the brain, often produces the

kind of global deficits which she continues to experience.

Dr. Stefani also observed that Roe Ann had developed severe permanent deficits in the use of both hands. Her voice and speech patterns were permanently affected. It was Dr. Stefani's opinion that Roe Ann could not be safely left unattended for more than one hour at a time. He recommended that she continue to receive physical and occupational therapy, speech and language therapy, and counseling services.

Another expert testifying for U.S. Bank was Dr. Gary Yarkony, who is board certified in physical and rehabilitation medicine and is a provider of lifelong care to disabled people. His examination of Roe Ann revealed that she suffered from cognitive dysfunction, lack of coordination, spasticity in her legs, and difficulty moving her fingers and coordinating her legs, which would move spontaneously. She was impulsive to the extent that she was a danger to herself because she could not control her impulses, actions and emotions, nor could she consider the consequences of her actions. Dr. Yarkony opined that Roe Ann requires medication for her spasticity and permanently requires diapers and bed pads. She would require 12 hours of in-home nursing care each day until she completed high school and then would require 24-hour-a-day nursing care. She would also require a wheel-chair-accessible home and van.

Economist, Dr. Larry DeBrock, testified for U.S. Bank and opined that the current cash value of Roe Ann's future medical and related care, based on a normal life expectancy, was approximately $9 million. The current cash value of her lost earnings was $1,113,600 if she only completed high school, and $1,981,685 if she graduated from college.

YMCA's medical expert was Dr. Ken Viste, board certified in neurology and

neurorehabilitation. His specialty is neurologic rehabilitation, which assists people in regaining as much function as possible after experiencing strokes, head or spinal cord injuries, and after diseases affecting the nervous system. Dr. Viste opined that Roe Ann only required three to four hours of assistance in the morning and the same in the evening each day. He disagreed that Roe Ann would require 24-hour-per-day in-home nursing care after leaving high school. If she could not live with her family, he opined that the cost of a group home or assisted living facility would range from $1,800 to $2,800 per month. He also did not believe that she needed ongoing physical therapy.

Based upon this testimony, YMCA presented the cost estimates of Thomas Daniel Walsh, an economic consultant. Walsh estimated that Roe Ann's future lost earnings would be $709,000 if she graduated from high school and $855,000 if she graduated from college. He opined that the current cash value of her future medical care was $1.1 million. At the close of all of the evidence, the parties proffered jury instructions, which included IPI pattern and non-IPI instructions. After closing arguments the trial court instructed the jury.

The jury awarded Roe Ann damages of $250,000 for disfigurement, $1 million for pain and suffering that she had already experienced, $2.5 million for future pain and suffering, $750,000 for current disability, $7 million for future disability, $354,497.06 for medical care that she had already received, $9,180,661 for future medical care, and $1,548,095 for the current cash value of lost future earnings. The jury award totaled $22,583,253.06, but that was reduced to a rounded-off amount of $15,468,277 after the jury found Roe Ann to be 30% comparatively negligent and after the trial court deducted $340,000 for out-of-court settlements received from CITGO and the Village of Harvey. This timely appeal followed the second trial.

10

ANALYSIS

We first consider YMCA's claim that the trial judge in the first trial erred when he granted U.S. Bank a new trial after the jury found in favor of YMCA and Sanderson. The trial court's ruling on a motion for a new trial is reviewed under an abuse of discretion standard. Ruffin ex rel. Sanders v. Boler, 384 Ill. App. 3d 7, 17, 890 N.E.2d 1174, 1183 (2008). This deferential standard is applied because it is the trial court which is in the unique position of being able to observe the witnesses and how they testified, as well as all the other circumstances relating to their credibility. Ruffin, 384 Ill. App. 3d at 17, 890 N.E.2d at 1183. The trial judge, in his findings rendered when ruling on U.S. Bank's motion for a new trial, explained that the deputy sheriff assigned to his courtroom, whom the judge described as "one of the best in the building," had reported to the judge the jurors' consternation ("in disbelief") upon hearing loud comments made by defense counsel during the first trial. YMCA contends that these comments were made out of the hearing range of the jury. In support of its argument, YMCA relies heavily upon the holding in Hartgraves v. Don Cartage Co., 63 Ill. 2d 425, 348 N.E.2d 457 (1976). In that case the trial court announced during trial that one of the jurors had been injured and could not serve. The court held an off-the-record conference with the attorneys. Back on the record, the court announced, over defense counsel's objection and request for a mistrial, that the trial would proceed with 11 jurors. When the trial concluded, the jury reached a verdict for the plaintiff. In an affidavit opposing the defendant's motion for a new trial, the plaintiff's attorney stated that during the off-the-record in-chambers discussion, defense counsel told the court that he would formally object to proceeding with 11 jurors. But according to the affidavit, defense counsel then also told the court he wanted his objection to be overruled, because he was

actually willing to proceed with 11 jurors. Defense counsel denied this account in his own affidavit in response to the motion for a new trial. Six months after trial, the trial court stated that it recalled that defense counsel had proposed a sham objection which the trial court would overrule. Accordingly, the trial court denied the motion for a new trial. On appeal the case was reversed and remanded for a new trial. In affirming that decision, the Illinois Supreme Court held:

> "[A]ny corrections of or additions to the record which contradict the
>
> clear and unambiguous contents of the record must be supported by
>
> something other than the 'clear memory' of the trial judge."
>
> Hartgraves, 63 Ill. 2d at 432, 348 N.E.2d at 461.

The Supreme Court noted that the record established that defense counsel had demanded a 12-person jury and nothing on the record contradicted that fact. Plaintiff's counsel had argued against the motion for a mistrial, but did not assert that defense counsel had stipulated to an 11-person jury. In fact, during argument on defense counsel's motion for a mistrial, counsel for the plaintiff and the defendant told the court, in answer to the court's direct question, that there had been no such stipulation. Accordingly, the Supreme Court found that it was reversible error for the trial judge to deny the motion for a mistrial. Hartgraves, 63 Ill. 2d at 432, 348 N.E.2d at 461.

We do not find Hartgraves to be applicable to the case before us. In the case of In re Estate of Gay, 353 Ill. App. 3d 341, 818 N.E.2d 860 (2004), this court found that Hartgraves was limited to instances where the trial court's recollection was directly contradicted by the record, so that if there was no such contradiction, the trial court would be permitted to rely upon its recollections. Gay, 353 Ill. App. 3d at 344, 818 N.E.2d at 863; relying on Paschen Contractors, Inc. v. Illinois State

Toll Highway Authority, 225 Ill. App. 3d 930, 935-36, 590 N.E.2d 539, 542-43 (1992). Nothing in the record before us impeaches or contradicts the trial court's recollection and therefore it was not error for the court to rely upon his recollection.

Although YMCA complains that the trial court launched no formal inquiry after being told by the deputy sheriff of the jurors' comments, YMCA points to no support for its argument that a formal inquiry by the trial court was required. The observation described by the trial court was relayed to him by a law enforcement officer, the deputy sheriff, assigned to the judge's courtroom. The trial judge was obviously present when defense counsel repeatedly engaged in what the court described as bad behavior which was disrespectful to our system of justice. The trial court specifically described that behavior as loud comments, which were purposefully made within the hearing range of the jury. The trial court found the behavior to be prejudicial to U.S. Bank. The trial court on several occasions resorted to quickly closing the courtroom door in an attempt to shield the jurors from hearing defense counsel's comments. Most importantly, based upon his own observations in conducting the trial, the trial judge made factual findings that defense counsel made these comments with the *deliberate intent* that the jury hear them, in an effort to "divert justice." The trial court also found that defense counsel knew his conduct was improper. The court cited to numerous instances when defense counsel apologized to the judge in chambers at the close of a day of bad behavior by defense counsel. The trial court also noted the ability of another defense attorney to temper his behavior after being admonished by the court just once.

As we have noted, the trial court's findings and opinions regarding defense counsel's behavior and the need for a new trial were communicated to the attorneys following the jury's verdict in the

first trial. However, during that trial there were many occasions when the trial judge admonished defense counsel and asked him to lower his voice. After the verdict, the court entered an order referring the parties to mediation in an effort to settle the case while taking U.S. Bank's motion for a new trial under advisement. The trial court's findings concerning defense counsel's behavior and remarks during the trial were revealed to the parties six months after the verdict in the first trial, when the court announced its ruling on U.S. Bank's motion for a new trial. It can reasonably be inferred that the trial court may have determined that the issue would be moot if the parties settled the lawsuit through the mediation process. It is unfortunate that the trial court did not inform the attorneys when his deputy sheriff informed him of the jurors' comments. However, that failure does not affect the trial court's decision making process in granting U.S. Bank a new trial. The trial court's findings were accompanied by comments regarding his own observations. When mediation was unsuccessful and the parties were informed of the trial court's findings and ruling, it is noteworthy that YMCA and Sanderson made no effort to refute the trial court's findings regarding defense counsel's behavior during the trial. Notwithstanding the passage of six months, at a minimum, counsel for YMCA and Sanderson could have taken issue with the judge's findings and made a record regarding those points that they believed refuted the trial judge's opinion and ruling. Their failure to make any effort to provide a record contradicting the trial court's findings considerably weakens their claim of abuse of discretion by the trial court.

The standard of review that we must apply to overturn the trial court's ruling based on the abuse of discretion alleged by YMCA requires us to conclude that no reasonable person would have made the same decision as the trial court in this case. Somers v. Quinn, 373 Ill. App. 3d 87, 95-96,

14

867 N.E.2d 539, 547 (2007). The trial court concluded that the repeated loud comments made by defense counsel, in spite of repeated admonishments by the court, were intended to be heard by the jury, for the purpose of creating prejudice, and were in fact heard by the jury and did in fact prejudice U.S. Bank, depriving it of a fair trial. This recollection was not contradicted by the record and so the trial court properly relied upon it. Gay, 353 Ill. App. 3d at 344, 818 N.E.2d at 863. Under these facts, we cannot say that no reasonable trial court would ever have come to the same conclusion. Ruffin, 384 Ill. App. 3d at 17, 890 N.E.2d at 1183. Accordingly, we find no abuse of discretion by the trial court and thus no error in the granting of U.S. Bank's motion for a new trial following the completion of the first trial.

Our remaining analysis concerns YMCA's allegations of error in the second trial, that it contends unfairly resulted in a verdict for U.S. Bank.

YMCA contends that in the second trial the new trial judge who presided over that trial erred by giving the jury a nonpattern instruction regarding a defendant's duty of ordinary care where a minor was involved. In addition to the Illinois Pattern Jury Instructions, Civil Nos. 10.02 and 10.04 (3d ed. 1995) (hereinafter IPI Civil 3d) regarding a defendant's duty of ordinary care, the trial court added an additional non-IPI instruction. IPI Civil 3d, Nos. 10.02 and 10.04 contain the following language, respectively:

> "When I use the words' ordinary care,' I mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for your

15

to decide."

> "It was the duty of the YMCA of Metropolitan Chicago, before and at the time of the occurrence, to use ordinary care for the safety of Roe Ann Lockhart, a minor. That means it was the duty of the YMCA of Metropolitan Chicago to be free from negligence."

The court also gave, over YMCA's objections, the following instruction on the duty of care. The non-IPI instruction contained the following language:

> "Where children may reasonably expect [*sic*] to be in a vicinity, a motorist, although still held to a standard of ordinary care, must exercise greater care for the safety of those children than he would for adults."

YMCA contends that the non-IPI instruction misled the jury and prejudiced YMCA.

During oral argument on this appeal, YMCA acknowledged that a non-IPI instruction may be given on certain occasions, including where the IPI instruction does not accurately state the law. Manus v. Trans States Airlines, Inc., 359 Ill. App. 3d 665, 668, 835 N.E.2d 70, 73 (2005). YMCA also argues, and we agree, that the two IPI instructions given by the trial court sufficiently stated the law. While recognizing that IPI Civil 3d, Nos. 10.02 and 10.04 accurately state the law under the facts of this case, YMCA nevertheless asserts that the giving of the additional non-IPI instruction negated the accuracy of the IPI instructions.

Here, the trial court's supplemental non-IPI instruction draws some support from Toney v. Mazariegos, 166 Ill. App. 3d 399, 403, 519 N.E.2d 1035, 1037-38 (1988). There a police officer's

vehicle struck a child who had wandered into the street from behind an ice cream truck. The appellate court found no error in the trial court's finding that the officer was negligent, and noted that where children were in the vicinity, a motorist, although still held to the standard of ordinary care, was required to exercise "greater care" for the safety of the children than he would have to exercise for adults in the vicinity. Toney, 166 Ill. App. 3d at 403, 519 N.E.2d at 1038; see Cooper v. Miller, 67 Ill. App. 3d 349, 352-53, 384 N.E.2d 919, 921 (1978) (it is for the jury to decide whether a person driving when children are in the vicinity has exercised due care). YMCA is mistaken when it asserts that Cates v. Kinnard, 255 Ill. App. 3d 952, 626 N.E.2d 770 (1994), forbids use of jury instructions utilizing the Toney holding. The Cates court merely held that under the particular facts of that case, the IPI instructions on the standard of ordinary care were sufficient and the court acted properly in not giving a Toney-based instruction. Cates, 255 Ill. App. 3d at 958, 626 N.E.2d at 774. In the case before us, Sanderson admitted that he saw children in the area as he approached the intersection, so under Toney his exercise of ordinary care had to include the degree of caution necessary when children were present. This does not translate to requiring a higher duty of care as argued by YMCA.

Nonetheless, YMCA correctly argues that the caution required by the presence of children in the vicinity could and should simply have been part of the final argument of U.S. Bank. Under that scenario, the presence of children in the vicinity would be highlighted to the jury as a factor in evaluating the reasonable foreseeability of harm under the facts of this case. Mt. Zion State Bank & Trust v. Consolidated Communications, Inc., 169 Ill. 2d 110, 116-117, 660 N.E.2d 863, 868 (1995). We specifically caution trial courts that the use of IPI instructions is mandatory unless those instructions are inadequate to properly state the law. LaSalle Bank, N.A. v. C/HCA Development

17

Corp., 384 Ill. App. 3d 806, 813, 893 N.E.2d 949, 957-58 (2008), citing Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 273, 775 N.E.2d 964, 972 (2002). In the present case, the non-IPI instruction was superfluous and should not have been given. However, unless the instruction clearly misled the jury and prejudiced the other party, a reviewing court will not reverse on this ground. Schultz, 201 Ill. 2d at 274, 893 N.E.2d at 973, LaSalle Bank, 384 Ill. App. 3d at 814, 893 N.E.2d at 958. Here the jury received the proper IPI instructions on the applicable standard to be applied to determine negligence. But as both parties agreed during oral argument, it was also permissible for the jury to take into consideration that children were present near the site of the accident in evaluating foreseeability. To determine whether an abuse of discretion has occurred, the reviewing court must determine "whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." Schultz, 201 Ill. 2d at 273-74, 775 N.E.2d at 973. Thus, we find no prejudice to YMCA and therefore no reversible error in the giving of the non-IPI instruction. It is also clear that the jury was not improperly swayed in favor of Roe Ann simply because she was a minor, given that the jury found Roe Ann to be 30% responsible for the accident.

YMCA also complains that its accident reconstruction expert was erroneously barred from testifying that the accident was unavoidable. YMCA asserts that its expert should have been allowed to testify that if, as U.S. Bank suggested, the van driver, Sanderson, had just made a right turn from 150th Street onto Dixie Highway, it would have been impossible for him to strike Roe Ann. Again we apply the abuse of discretion standard. The trial court permitted the expert to testify as to his calculations regarding the time that Sanderson would have had to avoid the accident, based upon

varying speeds and varying starting points on the sidewalk for Roe Ann. The jury was free to conclude from this testimony that Sanderson was free from negligence. But the additional testimony that YMCA sought to elicit from the expert would have supplanted the jurors' role as fact finders. YMCA wanted the jurors to hear its expert's unequivocal testimony that the accident was unavoidable and that one of U.S. Bank's theories, suggesting negligence by Sanderson in making a right turn, was impossible. The expert's calculations of feet per second arising from different speeds and a driver's resulting reaction time are obviously matters beyond the knowledge of ordinary jurors. But jurors are certainly capable of drawing reasonable inferences from scientific facts regarding the negligence or lack thereof arising from these calculations. That is what juries are supposed to do. For YMCA to have had its expert testify that under these facts there could be no negligence by U.S. Bank or Sanderson, would have invaded the jury's proper role and was correctly excluded. Watkins v. Schmitt, 172 Ill. 2d 193, 205-207, 665 N.E.2d 1339, 1385-86 (1996). It is clear that YMCA's expert was permitted to testify to those scientific matters that were not within the knowledge of ordinary jurors.

The facts at issue here are clearly distinguishable from those of Turner v. Williams, 326 Ill. App. 3d 541, 762 N.E.2d 70 (2001), cited by YMCA. In Turner there were multiple varying accounts of the speed of the two vehicles involved in an accident. The Turner court found that under those circumstances, where the conflicting testimony as to vehicle speeds could have confused the jury, it was error not to permit an expert to testify as to his determination of the speeds of the vehicles based upon the application of computer programs. Turner, 326 Ill. App. 3d at 545, 762 N.E.2d at 81. In the case before us, to quote from YMCA's opening brief, "It was undisputed that Sanderson

was traveling between 15 and 25 miles per hour at the time of the accident, well below the posted speed limit of 40 miles per hour." Clearly in this case the lay testimony did not threaten to confuse the jurors on this point. YMCA's expert witness was permitted to testify to scientific observations not within the general knowledge of the jury, but he was barred from expressing his opinion on ultimate facts, which were rightfully for the jury to determine. This was clearly within the trial court's discretion. Accordingly, we hold that the trial court did not abuse its discretion and thus did not commit reversible error in barring the additional testimony of YMCA's expert.

YMCA also contends that the trial court erred in refusing to give the jury YMCA's requested missing-witness instruction since U.S. Bank chose not to present the testimony of the accident reconstruction expert whom it had called in the first trial. The missing-witness instruction is to be given only if the court determines that the witness would have been produced by the party if his testimony was favorable; the witness was available to the one party and not equally available to the opposing party; a reasonably prudent person would have produced the witness had they believed the witness would testify in their favor; and no other reasonable excuse for the decision not to produce the witness is shown. Montgomery v. Blas, 359 Ill. App. 3d 83, 86-87, 833 N.E.2d 931, 934 (2005).

YMCA's argument in favor of this instruction falls short of meeting a number of these criteria. Most notably, new trial counsel for U.S. Bank, just prior to opening arguments in the second trial, told the court that he had determined that his case could properly be brought without the use of expert testimony concerning how the accident occurred. After all, the van driver, Sanderson, had admitted that he did not see Roe Ann until he actually struck her, despite the fact that the accident occurred in broad daylight. Sanderson also testified that he saw two different groups of school

children in the area as he approached the intersection where the accident occurred. Additionally, notwithstanding its contention on appeal that the trial court erred, YMCA never attempted to find or subpoena U.S. Bank's expert from the first trial in order to secure his testimony at the second trial. YMCA cannot now contend that the expert was not as available to it as he was to U.S. Bank. We cannot determine from the record before us whether the other criteria outlined above regarding the missing witness instruction are present here. We have only the proffered explanation by U.S. Bank's counsel for the second trial, as recounted above. So, we cannot say that the explanation given by U.S. Bank's counsel for declining to call the expert is unreasonable or untrue. Accordingly, we hold that the trial court did not err in refusing to give the missing-witness instruction requested by YMCA.

YMCA next contends that the damages awarded by the jury were grossly excessive and the product of passion and prejudice. We have summarized U.S. Bank's expert's testimony calculating damages of approximately $10 million to $11 million solely for Roe Ann's future medical care and lost earnings. This amount did not include compensation for disfigurement, past, present, and future pain and suffering, past, present and future disability, and past and current medical expenses. Illinois case law clearly establishes that a jury's award is not to be a simple mathematical calculation. The jury may properly take into account such factors as the extent of the injuries, the expected duration of those injuries, the plaintiff's age, future deterioration, and the restrictions the plaintiff will have to endure because of the injuries. Epping v. Commonwealth Edison Co., 315 Ill. App. 3d 1069, 1072, 734 N.E.2d 916, 919 (2000). There was extensive testimony concerning the extent and severity of Roe Ann's mental and physical injuries, and additional factors that could properly be considered by the jury. Further, it is within the province of the jury to weigh the testimony of the various witnesses

21

including experts and determine which testimony it will accept. In this case, although YMCA's experts presented significantly lower estimates regarding potential damages, the jury clearly rejected that testimony as is its right. Accordingly, we find no abuse of discretion in the jury award.

Finally, YMCA asserts that U.S. Bank's counsel in the second trial, brought the question of insurance into the case by telling the jurors during closing argument that it was not their concern where the money for payment of damages would come from. We find that this remark is isolated in the context of all of the evidence adduced in the entire second trial and closing arguments. YMCA also contends that certain remarks made by U.S. Bank's counsel encouraged the jury to overcompensate U.S. Bank for any comparative negligence deductions. We note that none of these remarks now complained of by YMCA on appeal were contemporaneously objected to by YMCA's counsel in the trial court. Thus the trial court was given no opportunity to consider the propriety of the remarks or to correct any impropriety that may have occurred or to instruct the jury accordingly. Ordinarily the failure to object to allegedly improper final remarks will result in forfeiture of that objection as an issue on appeal. Velarde v. Illinois Central R.R. Co., 354 Ill. App. 3d 523, 543-44, 820 N.E.2d 37, 57 (2004). Even when a contemporaneous objection to the trial court properly presents an allegation of improper remarks, that determination is ordinarily left to the trial court's considerable discretion. Lisowski v. MacNeal Memorial Hospital Ass'n, 381 Ill. App. 3d 275, 289, 885 N.E.2d 1120, 1135 (2008). We will not reverse on the grounds of improper remarks by counsel in final arguments unless those remarks were so egregious or prejudicial as to deny the defendant a fair trial. Velarde, 354 Ill. App. 3d at 544, 820 N.E.2d at 57. We do not find that the remarks at issue here constitute the kind of error which would have denied YMCA a fair trial. Accordingly, we

22

hold that there is no basis for reversal on that ground.

For the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

Affirmed.

QUINN and ROBERT E. GORDON, JJ., concur.